UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOSEPH DOOLEY and ELIZABETH DOOLEY,

        Plaintiffs,

    v.

SCOTTSDALE INSURANCE COMPANY,

        Defendant

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-1838
(JEI/KMW)

**OPINION**

**APPEARANCES:**

MASTER WEINSTEIN SCHATZ MOYER, P.C.
By:  Steven J. Schatz, Esq.
100 Grove Street
Haddonfield, NJ 08033
    Counsel for Plaintiffs

PRUTTING & LOMBARDI
By:  George A. Prutting, Jr., Esq.
701 South White Horse Pike
Audubon, NJ 08106
    Counsel for Defendant

**Irenas**, Senior District Judge:

Plaintiffs bring this action to recover insurance benefits under a surplus lines homeowner's insurance policy issued by Defendant Scottsdale Insurance Co. ("Scottsdale").

Presently before the Court is Defendant's motion for summary judgment. For the following reasons, the motion will be **DENIED** as to Plaintiffs' claims for breach of contract (Count I)

and for a declaratory judgment (Count III).  The motion will be **GRANTED** as to Plaintiffs' bad faith claim (Count II).

## I.

The Court recites those facts relevant to deciding the pending motion for summary judgment and resolves any disputed facts or inferences in favor of Plaintiffs, the nonmoving party.

In April 2008, Plaintiffs Joseph and Elizabeth Dooley purchased a two story, two bathroom vacation home located at 105 Bark Drive, Ocean City, New Jersey.  (Pls.' Counter-Statement of Material Facts ("P.C.S.F.") at ¶ 2)  Plaintiffs stayed in the home the weekend of December 11-12, 2010, and left with the intention of returning on December 31, 2010, for the New Year's holiday.  (Def.'s Statement of Material Facts ("D.S.F.") at ¶ 4)

On December 20, 2010, the Ocean City Fire Department responded to a neighbor's report of a water leak at the Dooley property and shut off water at the street valve.  (Expert Report of Frederic Blum at 3, Ex. Q to Def.'s Motion for Summary Judgment ("D.M.S.J."))  Plaintiffs were not aware of the leak until they returned to the house on December 31, when they noticed that water had discharged from the second floor bathroom where an inside wall shower diverter pipe and two inside wall

sink pipes had burst.[1]  (D.S.F. ¶ 6)  Water usage records indicate that approximately 22,000 gallons leaked into the Dooley residence.  (Blum Rpt. at 3)  Plaintiffs claim damage to the property exceeded $160,000.  (P.C.S.F. ¶ 1)

Immediately after noticing the discharge of water on December 31, 2010, Plaintiffs contacted Scottsdale, their insurance provider, through its representatives, and were given a claim number.  (Id. at ¶ 3)  Plaintiffs had purchased a surplus lines insurance policy with Scottsdale in 2008 prior to closing on their home.  Plaintiffs used a retail agent, The McMahon Agency ("McMahon"), to procure a homeowners' policy on their behalf.  McMahon then contacted Defendant's general agent, FTP, Inc., an insurance wholesaler, for placement of the Dooley's homeowners' policy through the surplus lines or secondary market.  FTP subsequently placed Plaintiffs' policy with Scottsdale with effective dates of coverage running from April 16, 2008 to April 16, 2009.  Plaintiffs later renewed their policy through the relevant time period.

There is an initial dispute regarding whether Plaintiffs ever received a complete copy of their policy.  Defendant submitted a certification from FTP vice president PJ Powell

---

[1] Based on the weather records, Defendant's Expert Frederic Blum concludes that the pipe must have frozen on December 15 and thawed on December 17. (Blum Rpt. at 5-6)  Water then leaked for around four days until Police shut off the valve on December 20.  (Id.)

stating that FTP mailed Plaintiffs' entire policy directly to
McMahon when Plaintiffs purchased the policy in 2008.  (Powell
Cert. ¶ 7, Ex. M to D.M.S.J.)  Angela Wolfe, a McMahon personal
lines manager, testified at her deposition that a May 22, 2008,
entry on the McMahon activity log shows McMahon had received
Plaintiffs' entire policy from FTP by that date.  (Wolfe Dep. at
48:8-49:11, Ex. N to D.M.S.J.).  Ms. Wolfe also said that
McMahon's normal procedure would then have been to mail the
entire policy to the Dooleys, but the log does not state
specifically that McMahon ever did so.  (Id. at 51:22-52:7)
Mrs. Dooley testified at her deposition that she and her husband
never received a copy of the full policy from McMahon, though
she never requested a full copy.  (E. Dooley Dep. at 10:6-12:10,
Ex. K to Pls.' Opposition ("P.O."))

     The Dooleys' policy states, in relevant part,

SECTION I – PERILS INSURED AGAINST
A. Coverage A – Dwelling  and  Coverage  B  –  Other
   Structures
   1. We insure against risk of direct physical loss to
      property described in Coverages A and B.
   2. We do not insure, however, for loss:
      a. Excluded under Section I – Exclusions;
         . . .
      c. Caused by:
         (1) Freezing  of  a  plumbing,  heating,  air
             condition  or  automatic  fire  protective
             sprinkler  system  or  of  a  household
             appliance,  or  by  discharge,  leakage  or
             overflow  from  within  the  system  or
             appliance  caused  by  freezing.  This
             provision  does  not  apply  if  you  use
             reasonable  care  to:

4

```
        (a)  Maintain heat in the building; or
        (b)  Shut off the water supply and drain all
             systems and appliances of water.
    . . .
  B. Coverage C - Personal Property
     We insure for direct physical loss to the property
     described in Coverage C caused by any of the following
     perils unless the loss is excluded in Section I -
     Exclusions.
     . . .
     14. Freezing
         a. This peril means freezing of a plumbing,
            heating, air conditioning or automatic fire
            protective sprinkler system or of a house-hold
            appliance but only if you have used reasonable
            care to:
            (1)  Maintain heat in the building; or
            (2)  Shut off the water supply and drain all
                 systems and appliances of water.
```

(Scottsdale Policy, Ex. K to D.M.S.J.)  The policy's

"Exclusions" section states as follows:

```
    SECTION I - EXCLUSIONS
    A. We do not insure for loss caused directly or
       indirectly by any of the following.  Such loss is
       excluded regardless of any other cause or event
       contributing concurrently or in any sequence to the
       loss.  These exclusions apply whether or not the loss
       event results in widespread damage or affects a
       substantial area.
    . . .
        5. Neglect
            Neglect means neglect of an "insured" to use
            all reasonable means to save and preserve
            property at and after the time of a loss.
```

(Id.)

        On January 5, 2011, Defendant assigned Sweet Claims Company

("Sweet Claims"), which, in turn, assigned Lisa Friedland, as

the independent adjuster investigating Plaintiffs' claim.

(D.S.F. ¶ 9)  Patricia Rice acted as the claims analyst for

Defendant.  Plaintiffs retained their own public adjuster, South
Jersey Adjustment Bureau, Inc. ("South Jersey"), on January 6,
2011.  (Expert Report of Gene Mehmel at 3, Ex. H to P.O.)

Frank Mazzitelli of Frank's Plumbing & Heating, who
completed repairs to the home in January 2011, described his
work as repairing "frozen and broken water pipes."[2]  (Frank's
Plumbing Invoice, Ex. E to D.M.S.J.)  Plaintiffs informed Sweet
Claims that they had left the heat on upon departing the house
on December 12, 2010.  (Sweet Claims 1/13/11 First Reporting at
4, attached to Friedland Dep., Ex. F to P.O.)  Ms. Friedland
subsequently contacted Atlantic City Electric, Plaintiffs'
electricity provider, to verify that the utility bill supported
Plaintiffs' story.  (Sweet Claims 2/14/11 Second Reporting at 3)

The utility bill Ms. Friedland obtained states that
Plaintiffs used 125 kWhs of electricity from November 16, 2010,
to December 16, 2010.  (12/16/10 Atlantic City Electric Bill,
Ex. G to D.M.S.J.)  In her Second Reporting to Defendant, dated
February 14, 2011, Ms. Friedland wrote that she called Atlantic
City Electric and asked whether 125 kWhs was enough to turn on
heat in the home, but the electric company refused to reveal any
information since she was not the customer.  (Second Reporting
at 3)  However, the woman with whom Ms. Friedland spoke, who

---

[2] The parties do not seem to dispute that the leaks resulted from pipes that
had frozen and burst.

"would not provide her name," apparently said that 125 kWhs was "probably a light usage for a one month period of time and not an electric heating home cost." (Id.) Based on this information, Ms. Friedland told Ms. Rice that she questioned whether Plaintiffs had the heat on during that month. (Id.)

On March 8, 2011, Defendant asked South Jersey to provide documentation from a plumber indicating why the pipe leaked. (3/8/11 Ltr. from Defendant to South Jersey, Ex. H to D.M.S.J.) The following day, in an email to Ms. Rice, Ms. Friedland stated that Sweet Claims "will not be able to prove the cause" of the pipe break and that "the only aspect we have to show that this heat was not on is the electric bill previously forwarded." (3/9/11 email from L. Friedland to P. Rice, Ex. O to P.O.) On April 4, 2011, South Jersey forwarded to Sweet Claims correspondence from Mr. Dooley stating that he had set all thermostats on low before leaving the house.[3] (4/4/11 Ltr. from J. Dooley to South Jersey, Ex. D to D.M.S.J.; Sweet Claims 4/4/11 Final Reporting at 2, attached to Friedland Dep., Ex. F to P.O.) In her Final Reporting, also dated April 4, 2011, Ms. Friedland wrote "the electric invoice clearly shows the heat was not on in this home at the time of the incident." (Id.)

---

[3] Mr. Dooley also stated that all outside water systems were drained and closed, and all interior water systems were closed and secured.

7

South Jersey submitted proofs of loss to Sweet Claims on July 5, 2011, and reiterated that Plaintiffs informed South Jersey that the house was heated at the time of loss. (7/5/11 Ltr. from South Jersey to Sweet Claims, Ex. J to D.M.S.J.) On August 26, 2011, Defendant sent a letter to Plaintiffs denying their claim based on the electrical billing. (8/26/11 Denial Ltr., Ex. C to D.M.S.J.) Plaintiffs filed the present suit on March 26, 2012.

Mr. Dooley maintained in his deposition that he turned all thermostats in the home to low, and closed all interior and exterior plumbing with the exception of the main valve, before he and his wife departed their house on December 12, 2010. (J. Dooley Dep. at 48:24-49:12) He testified that he completed the same routine every time he and his wife left the house during prior winters and the pipes had never frozen. (Id.)

Defendant's expert, Frederic Blum, concludes that it was "not possible" that the thermostats were kept on low. (Blum Rpt. at 6) According to Blum, the lowest setting of most thermostats is generally 45-50 degrees Fahrenheit, and a house will not freeze even if all thermostats were set as far down as possible. (Id. at 7) For this reason, he states that it is not possible that the heat was turned on in Plaintiffs' house. (Id. at 6) Blum supports his conclusion with Plaintiffs' electric bills and weather records from October to December 2010, along

with the bills and weather records for the same time span in
2009.  Plaintiffs' December 2010 electric bill states that
Plaintiffs used 125kWh of electricity in the house from November
16, 2010 to December 16, 2010, when the average temperature was
41 degrees Fahrenheit.  (Electric Bill, Ex. G to D.M.S.J.)
Plaintiffs used 176 kWh of energy during that same period in
2009, when the temperature averaged 46 degrees.  (Blum Rpt. at
7)  Blum acknowledges that, without knowing the exact usage of
the house during each pay period, month to month comparisons are
impossible.  (Id.)  However, he notes that the November-December
2010 usage is "conspicuously low."  (Id. at 7-8)  Further, he
writes that most of that usage in 2010 would have been consumed
during the December 11-12 weekend Plaintiffs spent at the house.
(Id. at 8)  The "very low usage" during that billing period, in
Blum's opinion, "indicates that the heat was entirely off after
the Dooleys departed on December 12."  (Id.)

     Defendant also submitted an affidavit of the records
custodian for Atlantic City Electric, who states that there was
no power outage or interruption of service to Plaintiffs' home
between December 12 and December 31, 2010.  (Atlantic City
Electric Aff., Ex. O to D.M.S.J.)  Plaintiffs submitted two
expert reports that opine on the ambiguity of the policy's terms
and the adequacy of Defendant's investigation of Plaintiffs'

claim.  Neither offers an explanation as to how the pipes could have frozen had Mr. Dooley left on the thermostats.

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *Id*. at 252.

In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).  "If the

10

evidence is merely colorable . . . or is not significantly
probative . . . summary judgment may be granted." *Anderson*,
477 U.S. at 249-50 (internal citations omitted). The Court's
role in deciding the merits of a summary judgment motion is to
determine whether there is a genuine issue for trial, not to
determine the credibility of the evidence or the truth of the
matter. *Id.* at 249.

## III.

Defendant moves for summary judgment on each count of
Plaintiffs' Complaint. Plaintiffs argue that summary judgment
should be denied for the following reasons: (1) Plaintiffs never
received a copy of their full policy, (2) the terms "reasonable
care" to "maintain heat" in the policy's exclusionary provisions
are ambiguous, and (3) there is a genuine dispute of material
fact as to whether Plaintiffs took reasonable care to maintain
heat in their home. Plaintiffs also claim that Defendant
breached its duty of good faith and fair dealing with respect to
the denial of Plaintiffs' claim for coverage under the policy.

The Court addresses each of these issues in turn.

### A. Plaintiffs' receipt of the policy

As an initial matter, Defendant asks the Court to issue a
finding that Plaintiffs either directly or constructively
received a full copy of the policy before the December 2010

11

incident.  Plaintiffs state that Defendant is not entitled to
such a finding because Plaintiffs never obtained a complete
version of their policy prior to the present lawsuit.
Plaintiffs further suggest, without any supporting case law,
that their not receiving the full policy somehow effects the
interpretation or application of the policy's exclusionary
language under which Defendant denied coverage.[4]  Based on the
evidence presented, the Court finds that Plaintiffs were in
constructive receipt of the full policy as a matter of law when
McMahon, acting as their retail agent, received a copy from FTP.
As a result, the Court will not address the potential impact on
coverage had Plaintiffs not received the policy.[5]

     There is clearly a dispute of fact as to whether Plaintiffs
themselves received a full copy of the Policy.  However, while
"[i]nsurance companies have an obligation to supply insureds
with a copy of their policy," *Edwards v. Prudential Prop. and
Cas. Co.*, 357 N.J. Super. 196, 204 (App. Div. 2003), under New
Jersey law, Plaintiffs need not have received the entire policy

---

[4] Plaintiffs present a paradoxical argument: they seek coverage for their loss
under the policy, even though they claim not to have received it, but, for
that very same reason, ask not to be bound by the policy's specific terms.
[5] The Court will note, however, that in unpublished opinions, both the
Appellate Division and this Court have declined to find that not receiving a
copy of a policy nullifies the provisions of the policy or abrogates their
applicability, especially where, as is the case here, the insured never
requested a full copy of the policy.  *See Coney v. Homesite Ins. Co.*, No. 08-
6151, 2010 WL 2925941, at *3 (D.N.J. July 15, 2010); *Friscia v. Andrade*, No.
L-5879-07, 2009 WL 3416058, at *4-5 (N.J. Super. App. Div. Oct. 9, 2009).

directly to be bound by its terms.  That McMahon received the full policy is sufficient.

"The delivery of information by an insurance company or insurance intermediary to the broker of the insured is tantamount to providing that information to the insured. *Sylvan Learning Sys., Inc. v. Gordon*, 135 F. Supp. 2d 529, 548 (D.N.J. 2000) (citing *TWBC III, Inc. v. Certain Underwriters at Lloyd's London Subscribing to Policy No. 89430548192*, 323 N.J. Super. 60, 66 (App. Div. 1999)).  The New Jersey Insurance Provider Licensing Act (IPLA) defines an "insurance broker" as "a person who, for commission, brokerage fee, or other consideration, acts or aids in any manner concerning negotiation, solicitation or effectuation or insurance contracts as the representative of an insured or proposed insured."  N.J.S.A. 17:22A-2g.

The Appellate Division's decision in *TWBC*, whose facts are analogous to this case, is instructive.  In *TWBC*, plaintiffs, who sought recovery under a surplus lines insurance policy, claimed that a surplus lines agent, acting on behalf of a surplus lines insurance provider, had not complied with its statutory obligation to provide plaintiffs with "evidence of insurance," as required by statue.  *TWBC III*, 323 N.J. Super. at 64-65.  However, the surplus lines agent had provided such evidence to plaintiffs' broker, who had originally been contacted by plaintiffs, and who then contacted the surplus

13

lines agent, to obtain insurance for plaintiffs. *Id.* Looking to the IPLA's definitions of "insurance agent" and "insurance broker," the Appellate Division recognized that the surplus lines agent represented the insurer and that the insurance broker represented the insured. *Id.* at 65. Since "[a] principal who selects someone to act for him is generally bound by the acts of that person within the apparent authority which he knowingly permits the person to assume," the court "s[aw] no reason why notice to the broker chosen by plaintiffs to act for them should not be deemed notice to plaintiffs themselves." *Id.* at 66 (internal quotations omitted). *See also Kramer v. Metro. Life Ins. Co.*, 494 F. Supp. 1026, 1031 (D.N.J. 1980) ("It is a long recognized rule of insurance law that delivery of a policy to an agent for the purpose of delivering it to a prospective insured is tantamount to actual delivery to that prospective insured.").

Here, McMahon clearly acted as Plaintiffs' insurance broker by obtaining insurance on their behalf from FTP, Defendant's insurance agent.[6]  The Court finds that when McMahon received the policy, Plaintiffs were in constructive receipt of the policy.

---

[6] Plaintiffs try to argue that *TWBC* does not apply here because McMahon was a "dual agent" for both Plaintiffs and Scottsdale in that McMahon also collected premiums on behalf of the insurer.  As a result, Plaintiffs contend that McMahon acted as Scottsdale's agent in delivering the policy to Plaintiffs rather than as Plaintiffs' agent in receiving the Policy.  The Court finds this characterization of the parties' relationships unconvincing. *TWBC* states that insurance brokers "act[ ] for the insured and represent[ ]

14

## B. Ambiguity of Terms

The parties disagree on how to interpret the policy's terms allowing for coverage when pipes freeze where the insured took "reasonable care" to "maintain heat."  While the Court disagrees with both parties' particular interpretations of these terms, the Court does not find the language to be ambiguous and will give these terms their ordinary meaning.

In New Jersey, courts "have consistently recognized that insurance policies are contracts of adhesion and are subject to special rules of interpretation." *Lee v. Gen. Acc. Ins. Co.*, 337 N.J. Super. 509, 513 (App. Div. 2001).  "[P]olicies should be construed liberally in [the insured's] favor to the end that coverage is afforded to the full extent that any fair interpretation will allow." *Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 537 (1990) (internal quotations omitted). Exclusion clauses in particular should be "strictly construed." *Simonetti v. Selective Ins. Co.*, 372 N.J. Super. 421, 429 (App. Div. 2004).

When interpreting insurance contracts, "the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a

---

the insured in *obtaining* insurance." *TWBC III*, 323 N.J. Super. at 65 (emphasis added).  McMahon's receiving a copy of the policy surely constituted an element of "obtaining" insurance on Plaintiffs' behalf.

15

reasonable meaning to the terms." *Id*. at 428.  Clear and unambiguous terms must be enforced as they are written.  *Id*. Ambiguities, on the other hand, must be resolved against the insurer.  *Id*.  "Yet, an insurance policy is not ambiguous merely because two conflicting interpretations have been offered by the litigants."  *Id*.  A genuine ambiguity arises only "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage."  *Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 247 (1979).

Plaintiffs argue that the terms "reasonable care" to "maintain heat" are not defined in the policy and therefore ambiguous.  They ask the Court to apply a subjective understanding of the terms.  Specifically, Plaintiffs suggest that an insured person took "reasonable care" to "maintain heat" if his actions were reasonable in his own mind.  Since Mr. Dooley testified that he believed his steps to maintain heat were reasonable, Plaintiffs state that Defendant should have covered their loss.

Defendant claims that the policy's language is clear and unambiguous, and the relevant terms should be given their ordinary meaning.  Defendant then provides the following interpretation of these terms: if the pipes in a house froze and the insured cannot present evidence of some intervening cause, such as vandalism, a broken window, or a power outage, then

16

"clearly an insured did not use reasonable care to maintain heat." (Def.'s Reply at 5)

In the Court's opinion, the parties offer conflicting interpretations of otherwise clear terms. The absence of a definition for "reasonable care" does not render that phrase ambiguous. The nature of coverage decisions, which must be made on a case by case basis, makes it impossible to define what constitutes "reasonable care" in any one situation. Further, the average policy holder would not be confused by the phrase "maintain heat," particularly in the context of an exclusionary provision related to "freezing." The Court will construe those terms, taken together, by their ordinary meaning: an insured individual would not be excluded from coverage for losses caused by freezing if he took objectively reasonable steps, i.e. steps an ordinary person in his position would have taken, to ensure that the temperature in his home remained above freezing.

Plaintiffs' subjective understanding of "reasonable care" to "maintain heat" is unworkable. Forcing Defendant to provide coverage whenever an insured person thought he did enough, whether or not that belief was objectively reasonable, would vitiate the exclusionary provision.

Defendant's circular construction of these terms is likewise troubling. According to Defendant's understanding of the policy, if pipes froze, the insured must not have acted with

17

reasonable care to maintain heat.  In other words, Defendant decides whether an insured individual acted reasonably based the outcome of that individual's acts, not by the acts themselves. Yet, when evaluating the objective reasonableness of an individual's behavior, one must look at how an ordinary reasonable person would have acted *at that time*.  Determining whether an individual exercised "reasonable care" by the result, rather than by the person's actions, would not be a reasonable reading of the policy.[7]  If Defendant intended to allow coverage for damage caused by freezing pipes only when some proven "extenuating circumstance" caused the pipes to freeze, then Defendant should have made that explicit in the policy.

Since the Court finds the "reasonable care" to "maintain heat" language in the policy to be unambiguous, it will apply the ordinary meaning of that language, as described above, in determining if there is a genuine dispute of material fact as to whether Defendant appropriately denied Plaintiffs coverage.

---

[7] Defendant underscores the problematic nature of their interpretation in their motion papers.  On the one hand, Defendant submitted an expert report stating that a house will not freeze if the thermostats are set to low. (Blum Rpt. at 7)  Based on that opinion, one could assume that turning the thermostats to low, which Mr. Dooley claims he did, would constitute "reasonable care" to "maintain heat."  Yet, in an apparent attempt to justify the denial of coverage even had Mr. Dooley left the heat on, Defendant also states that, since weather conditions change, keeping thermostats on low one year may not be adequate the next year.  (D.M.S.J. at 27)  Here, Defendant looks only to the end result – the frozen pipe – and characterizes what one would assume to be reasonable care as unreasonable.

### C. Plaintiffs' actions to maintain heat in the home

Defendant's motion for summary judgment must fail as to Plaintiffs' breach of contract and declaratory judgment claims because there is a genuine dispute of material fact as to whether Mr. Dooley kept the thermostats on low when he and Mrs. Dooley left their house on December 12, 2010. Had Mr. Dooley done so, a reasonable jury could find that he took "reasonable care" to "maintain heat" in the home and that Defendant should have covered Plaintiffs' loss.

Mr. Dooley testified in his deposition, and stated in an earlier letter to his public adjuster while Defendant considered his claim, that before he and Mrs. Dooley left their house on the relevant weekend, he shut off all interior water systems, drained and closed all outside water systems aside from the main valve, closed all windows and storm windows, and, most relevant here, turned all thermostats to low. (J. Dooley Dep. at 48:24-49:12; J. Dooley Ltr. to South Jersey, Ex. D to D.M.S.J.) Mr. Dooley stated that he had gone through the same routine each time he left the house during prior winter months and had never experienced any issues with water leaks. (Dooley Dep. at 37:14-39:21)

Defendant claims that Mr. Dooley could not have left the thermostats on low. Frederic Blum, Defendant's expert, argues that a house will not freeze if all thermostats were on, even if

19

they were set as far down as possible.  (Blum Rpt. at 7)
According to Blum, the Dooleys' electric utility bill for the
November 16 to December 16, 2010, period, which shows a "very
low usage" of electricity, "indicates that the heat was entirely
off after the Dooleys departed on December 12."  (Id.)

　　　At this posture, the Court must make all inferences in
favor of Plaintiffs, the non-moving party.  A jury will
determine the credibility of Mr. Dooley's testimony and the
weight of any contradictory expert report.[8]  At this stage,
however, assuming that Mr. Dooley kept the thermostats on low
when he and his wife left their house on December 12, as was his
usual routine, and considering the statement from Defendant's
own expert that a house does not freeze if thermostats are set
on low, a reasonable jury could find that Plaintiffs took
"reasonable care" to "maintain heat" and their losses should
have been covered under their policy.  For these reasons, the

---

[8] As the Court sees it, Defendant's core argument is that Mr. Dooley could not
have turned the thermostats to low before leaving the house because, had Mr.
Dooley done so, it would have been "scientifically impossible for the pipes
to freeze." (D.M.S.J. at 21)  The Court does not accept such an
oversimplified conclusion, which ignores even Defendant's expert Frederic
Blum's comment that, when the heat is on, an avenue of cold outside air can
still cause local freezing that affects pipes in a limited area.  (Blum Rpt.
at 7)  Neither party seems to have inspected whether there were limited areas
within Plaintiffs' fifty-year old house, specifically the second floor
bathroom in which all three pipes burst, that could fall below freezing even
with the thermostats on low (Blum writes merely that no such avenue of cold
air was found or reported).  Nobody addresses the quality of the insulation
in the house.  Simply put, pipes can freeze even in an otherwise heated home
based on the location of the pipes, the insulation of the pipes, and the
insulation of the home in general.  Defendant's "scientifically impossible"
conclusion goes too far.

Court will deny Defendant's motion for summary judgment as to Plaintiffs' breach of contract and declaratory judgment claims.

### D. Plaintiffs' Bad Faith Claim

Since Plaintiffs have not presented sufficient evidence from which a jury could find that Defendant acted in bad faith when it denied Plaintiffs' insurance claim, the Court will grant Defendant's motion for summary judgment as to Count II of Plaintiffs' Complaint.

The Supreme Court of New Jersey has recognized an insured's cause of action against an insurer for the bad-faith failure to pay the insured's claim. *Pickett v. Lloyd's*, 131 N.J. 457, 470 (1993). The *Pickett* court stated that, "[t]o show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Id*. "If a claim is 'fairly debatable,' no liability in tort will arise." *Id*. at 473.

Explaining how the "fairly debatable" standard operates in the context of the denial of benefits on the basis of non-coverage, the *Pickett* court stated that "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Id*. As a result, when a plaintiff brings a bad faith

21

cause of action, courts must determine whether there are any genuine issues of material fact that would preclude summary judgment in plaintiff's favor on the underlying claim for coverage.  "If factual issues exist as to the underlying claim (i.e., questions of fact as to whether plaintiff is entitled to insurance benefits-plaintiff's first cause of action), the Court must dismiss plaintiff's second cause of action-the 'bad faith' claim."  *Tarsio v. Provident Ins. Co.*, 108 F. Supp. 2d 397, 401 (D.N.J. 2000).

Here, as detailed above, there is a genuine dispute of material fact as to whether Mr. Dooley left the thermostats on before he and Mrs. Dooley departed their house on December 12, 2010.  This dispute would preclude the Court from granting summary judgment in Plaintiffs' favor on their underlying claim for coverage.  The Court will therefore grant Defendant's motion for summary judgment as to Plaintiffs' bad faith claim.

**IV.**

        For the reasons stated above, the Court will deny

Defendant's motion for summary judgment as to Counts I and III

of the Complaint.  The Court will grant Defendant's motion as to

Count II of the Complaint.  An appropriate Order accompanies

this Opinion.


DATE: February 18, 2015


                                    ___s/ Joseph E. Irenas_____ _
                                    Joseph E. Irenas, S.U.S.D.J.